IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| THE SPOILAGE CUTTER COMPANY, INCORPORATED, d/b/a Martor, USA, | ) ) ) | |
| Plaintiff, | ) | No.  08 C 1263 |
| v. | ) ) | Judge Robert W. Gettleman |
| WORLD KITCHEN, LLC, | ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs, The Spoilage Cutter Company Incorporated, d/b/a Martor USA ("Martor USA") and Martor KG (collectively, "Martor"), have brought a three count Third Amended Complaint ("Complaint") against defendant World Kitchen, LLC ("World Kitchen") alleging patent infringement and breach of contract, or alternatively, unjust enrichment.  World Kitchen challenged Martor's standing to bring an action for infringement, alleging that Martor did not own the patent in question.  This court has already determined that Martor has standing to bring this action.  The Spoilage Cutter Co. v. World Kitchen, LLC, No. 08 C 1263 (N.D. Ill. Jan. 27, 2010).  In World Kitchen's Answer to the Third Amended Complaint defendant World Kitchen denies each count, raises twelve affirmative defenses, and counterclaims alleging non-infringement, patent invalidity, breach of contract, unenforceability of certain provisions of the contract, and that this is an exceptional case meriting an award of attorneys' fees and costs.

Martor has now moved for partial summary judgment on its claim that World Kitchen materially breached the contract, and on World Kitchen's counterclaim that Martor breached the contract.  Additionally, Martor moved to strike portions of World Kitchen's Statement of Facts.  World Kitchen has also moved for summary judgment on its counterclaims of non-infringement,

invalidity, and breach of contract. For the reasons stated below, the court grants World Kitchen's motion for summary judgment of non-infringement and breach of contract but denies World Kitchen's motion for summary judgment of invalidity and attorneys' fees. The court partially grants Martor's motion to strike portions of World Kitchen's statement of facts in support of summary judgment. The court further denies Mortar's motion for partial summary judgment for breach of contract.

## BACKGROUND

In 2005, Martor USA filed suit against World Kitchen alleging that its FLEX-GUARD® SK-6 safety cutter infringed U.S. Patent No. 6,148,520, entitled "Box Cutter with Autoretracting Blade" ("the '520 patent").[1] On November 11, 2005, the parties entered into a Settlement Agreement and Mutual Release ("Settlement Agreement") resolving that dispute. In that Settlement Agreement, Martor granted World Kitchen a covenant not to sue, and World Kitchen agreed that it would not make a safety cutter that included the autoretraction mechanism of the '520 patent.

In 2007, World Kitchen began selling a safety cutter in the United States known as the OLFA® SK-8 ("SK-8"). On March 3, 2008, Martor filed the instant action alleging that World Kitchen's sales of the SK-8 infringe one or more claims of U.S. Patent No. 6,785,966, entitled "Box Cutter with Autoretracting Blade" ("the '966 patent") and breach the terms of the Settlement Agreement. The '966 patent issued in 2004 and is directed to an improvement that

---

[1] *The Spoilage Cutter Company, Inc. v. World Kitchen, Inc.*, No. 05 C 3252 (N.D. Ill. dismissed Nov. 18, 2005).

enabled box cutter blades to autoretract in modes of use not contemplated by the technology of the earlier issued '520 patent.

## DISCUSSION

### I.  Legal Standard

A movant is entitled to summary judgment under Rule 56 when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Unterreiner v. Volkswagen of Am., Inc.,* 8 F.3d 1206, 1209 (7th Cir.1993).

### II.  Motion to Strike

Martor has moved to strike two of World Kitchen's exhibits, a demonstrative DVD with a slide presentation highlighting the operation of the SK-8 as it relates to the '966 patent (Exhibit 200) and an additional declaration by expert witness Dr. Karvelis (Exhibit 202), because they were allegedly filed after the close of discovery in violation of Federal Rule of Civil Procedure 26 (a)(2)(C).  Additionally, Martor has moved to strike paragraphs 203, 205–06, 209–10, 213–17, 221, 226–27, 234, 236, 238, 240–44, and 246 of World Kitchen's statement of undisputed facts in support of its motion for summary judgment.  Martor argues that those paragraphs contain improper opinions, speculation, arguments, or legal conclusions in violation of Fed. R. Civ. P. 56 and Local Rule 56.1.

World Kitchen responds by noting that:  1) the substance of Exhibit 200 is not new and it was subject to full discovery; 2) each of the paragraphs in Exhibit 202 is supported verbatim or in substance by one of Dr. Karvelis' previous declarations; 3) the assertions in all of the

paragraphs of its Statement of Material Facts are proper in a patent infringement and validity case as well as a breach of contract case; and 4) World Kitchen is entitled to attorney's fees for responding to what it considers a groundless motion.

### A. Exhibits 200 and 202

Federal Rules of Civil Procedure 26(a)(2)(B) and (C) establish the requirements for written expert opinions. Specifically, an expert must submit to the opposing party "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed.R.Civ.P. 26(a)(2)(B)(I). The report must also include "any exhibits that will be used to summarize or support [the expert's opinions]." Fed.R.Civ.P. 26(a)(2)(B)(iii). Further, the party submitting the report must disclose the report "at the time[] and in the sequence that the court orders." Fed.R.Civ.P. 26(a)(2)(C).

In the instant case, the court ordered a discovery cut-off date of July 8, 2009. At that time, discovery was complete and no further submission of expert exhibits was appropriate. World Kitchen submitted Exhibits 200 and 202 on September 11, 2009, along with its motion for summary judgment. Consequently, the exhibits were not timely. World Kitchen's contention that the exhibits contained no new material is irrelevant. Martor's motion to strike is granted with regard to Exhibits 200 and 202.

### B. Paragraphs 203, 205–06, 209–10, 213–17, 221, 226–27, 234, 236, 238, 240–44, and 246

Local Rule 56.1 requires that a moving party submit "a statement of material facts as to which moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." L.R. 56.1(a)(3). The document should include "specific references to the affidavits, parts of the record, and other supporting materials relied upon to

support the facts set forth in that paragraph." L.R. 56.1. The statement cannot satisfy the requirements of L.R. 56.1 if the statement is not supported by evidence. *Id.*

In a motion for summary judgment of patent invalidity for obviousness, the moving party must identify what would have been obvious to a person having ordinary skill in the art, and to support this assertion the moving party must cite the opinion of a person having ordinary skill in the art. 35 U.S.C. § 103. Both Mr. Godsted and Dr. Karvelis, the experts in the instant case, are persons having ordinary skill in the art. Therefore, statements supported by Mr. Godsted and Dr. Karvelis in World Kitchen's motion for summary judgment properly assert opinions of persons having ordinary skill in the art to support the position of obviousness. Accordingly, Martor's Motion to Strike regarding paragraphs 203, 214–17, 226–27, 234, 236, 238, 240, and 246 is denied.

Because Martor's Motion to Strike was granted with regard to Exhibits 200 and 202, paragraphs that cite only those exhibits in World Kitchen's Statement of Facts are unsupported by the record. In World Kitchen's Response to Martor's Motion to Strike, it identified additional support for the each of the assertions in Exhibit 202 in Dr. Karvelis' other, timely filed, expert reports. Therefore, World Kitchen can support its statements originally citing Exhibit 202 with support from Dr. Karvelis' earlier filed expert reports for paragraphs 205–06, 209–10, 214–16, 221, 234, 241–44, and 246. Paragraph 213, however, is supported only by Exhibit 200, and Exhibit 200 is not supported by Dr. Karvelis' earlier filed expert reports. Accordingly, Martor's Motion to Strike with regard to paragraph 213 is granted but the Motion to Strike paragraphs 205–06, 209–10, 214–16, 221, 234, 241–44, and 246 is denied.

**III. World Kitchen's Motion for Non-Infringement**

Patent infringement analysis is a two-step process comprising the steps of, (1) interpreting the patent claims, and (2) comparing the "properly" interpreted claims with the accused device. *Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1454 (Fed.Cir.1998).  Under the all-limitations rule, "[t]o infringe a claim, each claim [element] must be present in the accused product, literally or equivalently." *Dawn Equip. Co. v. Ky. Farms Inc.,* 140 F.3d 1009, 1014 (Fed.Cir.1998).  Summary judgment of non-infringement is proper where there is no genuine issue as to whether the accused device lacks a single claim element or its equivalent. *Lockheed Martin Corp. v. Space Sys./Loral, Inc.,* 324 F.3d 1308, 1321 (Fed.Cir.2003).

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed.Cir.2005) (en banc) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,* 381 F.3d 1111, 1115 (Fed.Cir.2004)).  The construction of patent claim terms is a question of law.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996).  Generally, the words of a claim are given their "ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention...." *Phillips,* 415 F.3d at 1312-13 (citations omitted).  "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313.

"[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* at 1315 (quoting *Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  The

Federal Circuit has reiterated that "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Phillips, 415 F.3d at 1316* (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

Claim 1, the only independent claim of the '966 patent, recites:

1.    An autoretracting knife comprising:

(a)    a housing;

(b)    a blade slide carrying a blade and displaceable longitudinally in the housing between a rear retracted end position with the blade wholly received in the housing and a front extended end position with the blade extending forward from the housing and through an intermediate position, the blade having an edge directed transversely and exposed outside the housing in the extended position;

(c)    a blade spring urging the blade slide continuously rearward into the retracted position;

(d)    an actuator slide displaceable longitudinally in the housing independently of the blade slide between a front end position and a rear end position and provided with an externally accessible actuating formation;

(e)    an actuator spring urging the actuator slide continuously into the respective rear position;

(f)    coupling means including a transversely displaceable coupling member on one of the slides engageable with the other of the slides for coupling the blade slide with the actuator slide for movement of the blade slide from its retracted position into its intermediate position on displacement of the actuator slide from its rear end position into its front end position and for decoupling the slides from each other and shifting the coupling member transversely out of a path of the other slide on movement of the blade slide from its intermediate position into its extended position; and

(g)    means including cam formations on the slides for displacing the blade slide into the extended position on exertion of a transverse force against the blade edge in the intermediate position of the blade slide.

World Kitchen argues summary judgment is warranted based on its claimed noninfringement of elements (b) and (g) of Claim 1.

**A. Claim 1, element (b)**

In their Joint Statement of Material Facts, the parties stipulate that the language of claim term 1(b):

> a blade slide carrying a blade and displaceable longitudinally in the housing between
>
> [1] a rear retracted end position with the blade wholly received in the housing and
>
> [2] a front extended end position with the blade extending forward from the housing and
>
> [3] through an intermediate position,

is construed to mean:

> a slidable member that holds a blade carrying a blade and moveable along a direction defined by a length of the housing in the housing between a
>
> [1] position in which the blade slide is furthest retracted into the housing with the blade wholly received in the housing and
>
> [2] a position in which the blade slide is furthest extended **as a result of exertion of a transverse force** against the blade edge with the blade extending forward from the housing and
>
> [3] through a position in which the blade slide is furthest extended in the longitudinal direction without the exertion of a transverse force against the blade edge.

In conventional cases, the court would determine the claim construction for the relevant claims of the patent. *Markman*, 52 F.3d at 977 ("[T]he construction of a patent claim is a matter of law exclusively for the court."). In the instant case, however, the parties have stipulated to a claim construction in a Joint Statement of Material Facts. Therefore, this court will adopt the parties stipulated claim construction.

The '966 specification provides the valuable insight into the meaning of the claim terms and helps define the meaning of the term "through an intermediate position." The specification explains that the autoretracting feature of the invention is implemented by a tension spring, which continuously urges the actuator slide and the blade slide backwards to the retracted position. In a cutting operation, starting from the retracted position, the user pushes the pusher button (No. 42 in Fig. 1 below), which is unitarily formed with the actuator slide (No. 27), which is coupled to the blade slide (No. 15), forward longitudinally to the intermediate position. From the intermediate position then, the transverse force of a cutting operation on the blade (No. 14) causes the blade slide to disconnect from the actuator slide and move forward. As a result, when the blade is disengaged from cutting a workpiece, the tension spring (No. 38) automatically retracts the blade slide (No. 15) to the retracted position. Two embodiments are disclosed in the specification describing mechanisms for disconnecting the blade slide from the actuator slide.





Fig.2

In the first embodiment, from the intermediate position, a force on the blade in one direction (direction z) "will pull the blade and its holder out a short distance W into the front end position." Figure 2 shows that the blade slide (No. 15) moves further forward (direction x) longitudinally a distance of length R due to the transverse force applied to the blade (No. 14) in a different direction (direction I). In other words, while the blade slide (No. 15) is in the intermediate position, a force on the blade (No. 14) in the direction I will "cam the blade out in the direction x." The figures show that movement in direction x results in further longitudinal movement forward beyond the intermediate position. In a second embodiment, shown in Figure 2A, the specification explains that from the intermediate position, a force (in direction I) on the blade "cams the slide out" until finally the blade slide moves forward longitudinally. Therefore,

both of the embodiments rely on further forward longitudinal movement of the blade from the intermediate position, as a result of a transverse force, in order to disconnect the blade slide from the actuator slide.



Fig. 2A

Claim 1, element (b)[2], properly construed, requires the blade to reach a furthest position "as a result of exertion of a transverse force against the blade edge." It is therefore

important to further define a "transverse force." The court looks to the patent specification and drawings for additional insight to determine the meaning of this term.

A force has two characteristics, a magnitude and a direction. Here, the direction of the transverse force is particularly relevant. The specification indicates that a "transverse force [is] in the direction I." Further, the specification indicates that a "lateral force [is] in the direction I." Other significant directions defined in the specification are directions x and z defined as directions along an axis M. Motion in the directions x and z is also described as longitudinal movement.

The relationships between directions I, x, and z are significant when defining a "transverse force." First, the specification interchanges the term "lateral" and the term "transverse" to define the direction I. Transverse means "[s]ituated or lying across; crosswise." AMERICAN HERITAGE DICTIONARY 1835 (4th ed. 2000). Lateral means "[o]f, relating to, or situated at or on the side." *Id.* at 990. These terms must be defined further by their relationship to the directions x and z defined by axis M as well as the drawings Fig. 1 and Fig. 2. In evaluating the terms and the drawings, it is clear that the transverse direction I is perpendicular to the direction defined by direction x and z and further defined by axis M. In other words, a "transverse force" in this context is a force perpendicular to the longitudinal direction defined in the '966 patent.

Claim 1, element (b)[2] therefore requires the blade to move into "a position in which the blade slide is furthest extended as a result of exertion of a [] force [in a direction perpendicular to the longitudinal direction] against the blade edge with the blade extending forward from the housing." Martor points out that the blade in the SK-8 moves past a position furthest extended

12

by normal operation. The force that moves the blade of the SK-8 past the position furthest extended by normal operation, however, is not a transverse force. Only a force on the blade in the longitudinal direction (akin to direction x and z in the '966 patent) will move the blade of the SK-8 past a position furthest extended by normal operation of the SK-8. Claim 1, element (b)[2], however, requires the blade slide to move to a furthest extended position "as a result of exertion of a transverse force on against the blade edge." The SK-8 may move into a furthest extended position as a result of a force, it does not move into a furthest extended position as a result of a "transverse force," as required by Claim 1, element (b)[2].

Therefore, because no "transverse force" on the blade edge in the SK-8 will cause the blade to move into a furthest extend position, the SK-8 does not include Claim (1) element (b)[2] and does not infringe Claim 1 of the '966 patent. Further, because Claims 2 and 3 depend directly from Claim 1, the SK-8 does not infringe Claim 2 or 3. Consequently, World Kitchen's SK-8 does not infringe the '966 patent.

### B. Claim 1, element (g)

As noted above, based on Claim 1, element (b), World Kitchen's SK-8 does not infringe the '966 patent. Therefore, it is not necessary to evaluate whether World Kitchen's SK-8 includes Claim 1, element (g) of the patent.

## IV. World Kitchen's Motion for Invalidity of the '966 Patent

Because World Kitchen's SK-8 does not infringe the ''966 patent, the court must decide whether World Kitchen's patent invalidity claim is moot. The Supreme Court rejected a strict per se policy of mooting claims of invalidity following a district court's ruling of non-infringement. *Cardinal Chemical Co. V. Morton Int'l*, 508 U.S. 83, 95 (1993). The Federal

Circuit, however, has determined that "[a] district court judge faced with an invalidity counterclaim challenging a patent that it concludes was not infringed may either hear the claim or dismiss it without prejudice, subject to review only for abuse of discretion." *Liquid Dymamics Corp. v. Vaughan Co.*, 355 F.3d 1361, 1370 (Fed. Cir. 2004) (citing *Nystrom v. TREX Co.*, 339 F.3d 1347, 1351 (Fed. Cir. 2003)). This court has determined that the invalidity issue should be decided because the issue of whether prior art originally before the examiner should be reevaluated by the court under the obviousness standard articulated by the Supreme Court in *KSR* has remained undecided until now. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 401–02 (2007).

A patent may be invalid for a number of reasons defined by Title 35 of the United States Code, including: 1) not patentable subject matter; 2) not novel; 3) obvious; 4) not enabled; or 5) does not disclose the best mode known to the inventor at the time of invention. 35 U.S.C. §§ 101–103, 112 (2006). A patent examiner from the United States Patent and Trademark Office ("USPTO") examines each patent application and issues patents only for inventions that meet all of the requirements of Title 35 of the United States Code.

In the instant case, World Kitchen contends that the '966 patent is obvious in view of prior art under 35 U.S.C. § 103. Section 103 indicates that "if the difference between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains," a patent may not be obtained. 35 U.S.C. § 103. To establish obviousness, it is "important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the new invention does."

*KSR*, 550 U.S. at 401. The court must consider that "a fact finder should be aware, of course, of the distortion caused by hindsight bias and must be cautious of arguments reliant upon ex post reasoning." *Id.* at 421. Further, "[d]efining the problem in terms of its solution reveals improper hindsight in the selection of the prior art relevant to obviousness." *Monarch Knitting Mach. Corp. v. Sulzer Morat GmBH*, 139 F.3d 877, 881 (Fed. Cir. 1998).

World Kitchen offers three distinct arguments that the '966 patent is obvious: (1) the '966 patent is an obvious improvement of the '520 patent because the '966 patent claims only the combination of cam mechanisms with the '520 patent to yield predictable results, and cam mechanisms have been known to persons having ordinary skill in the mechanical design field long before the invention of the '966 patent; (2) the '966 patent is an obvious combination of the '520 patent and German Unexamined Patent Application No. DE 43 15 495 entitled "Safety Knife" ("the '495 application"); and (3) the '966 patent is an obvious combination of the '520 patent and U.S. Patent No. 5,406,707 entitled "Utility Knife with Improved Slide" ("the '707 patent").

**A.   The combination of the '520 patent and the general knowledge of cams for persons having ordinary skill in the mechanical design field**

World Kitchen contends that the '966 patent is obvious in view of the '520 patent and the knowledge of a person having ordinary skill in the art regarding cam mechanisms. The parties have agreed that a person having ordinary skill in the art is a person having at least a bachelor's degree in mechanical engineering, or its equivalent, and at least 2 to 3 years of work experience in an engineering area. World Kitchen argues that the only element in the claims of the '966 patent that is not disclosed in the '520 patent is element (g), "means including cam formations on

the slides for displacing the blade slide into the extended position on exertion of a transverse force against the blade edge in the intermediate position of the blade slide."

World Kitchen contends that a mechanical design textbook published in 1935 entitled Ingenious Mechanisms for Designers and Inventors contains common knowledge regarding cam mechanisms and the use of cams as mechanisms to transfer the direction of motion between parts. Presumably, World Kitchen believes a person having ordinary skill in the art would have studied a similar textbook and would have knowledge about the use of cam mechanisms. It asserts that there is reason to believe that similar textbooks have been around since 1935 referencing cam mechanisms and their uses and before Martor filed the patent application for the '966 patent.

Martor responds to World Kitchen's accusations regarding the textbook by first noting that because the '966 patent was examined by an examiner at the USPTO, and the USPTO issued the '966 patent, the '966 patent is presumed to be valid. 35. U.S.C. § 282. Martor notes that the examiner is a person having ordinary skill in the art, presumably knowing about the use of cam mechanisms to translate motion from one direction to another. Finally, Martor points out that although the use of cams is an older technology, that point alone does not conclusively indicate that one having ordinary skill in the art would have known to use cam mechanisms in an application to automatically retract a blade into a utility knife after the cutting operation.

A patent that has been issued is presumed valid. 35 U.S.C. § 282; *KSR*, 550 U.S. at 412. Therefore, World Kitchen has a very high burden to prove that the previously issued '966 patent is invalid under Section 103 as obvious in view of prior art. 35 U.S.C. § 103. World Kitchen argues that because the '520 patent is prior art, and the use of cam mechanisms and their

function is also known to persons having ordinary skill in the art, this combination of prior art yields predictable results and is obvious without any further analysis. World Kitchen cites the Supreme Court's holding in *KSR* to support its assertion, noting "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *KSR*, 550 U.S. at 416.

World Kitchen, however, fails to recognize other Supreme Court guidance in *KSR*. In *KSR*, the Court noted that the obviousness question is not what was an obvious combination to the inventor at the time of invention, but rather what was an obvious combination to a person having ordinary skill in the art. *Id.* at 420. It also established guidance on how obviousness claims should be analyzed, noting, "[t]o facilitate review, this analysis should be made explicit. '[R]ejections on obviousness grounds cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness.'" *Id.* at 418 (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006). Finally, the Supreme Court stated that using hindsight to determine obviousness was dangerous and should be avoided. *Id.* at 421.

In the instant case, World Kitchen has used hindsight and conclusory statements in attempting to rebut the presumption that the '966 patent is valid and non-obvious by citing the combination of the '520 patent and the general knowledge of a person having ordinary skill in the art regarding the use of cams to change the direction of motion between two working parts. This argument is not substantial enough to overcome the high burden on World Kitchen to prove that the previously issued '966 patent is obvious. *See* 35 U.S.C. § 282. To overcome this presumption, World Kitchen would have needed to identify specific reasons why combining the

'520 patent and the general knowledge about the use of cams would have been obvious to a person having ordinary skill in the art. *KSR*, 550 U.S. at 418. World Kitchen has presented no such reason. Therefore, the combination of the '520 patent and the general knowledge of cam mechanisms and their function does not render the '966 patent obvious.

### B. The combination of the '520 patent and the '495 application

World Kitchen also contends that the '495 application, a German design for an auto-retracting utility knife, in combination with the '520 patent would render the '966 patent obvious because the '495 application includes cam mechanisms (mechanical devices) used to change the direction of the motion of another part moving against it and discloses an invention with a retractable blade.

Citing *KSR*, Martor responds by arguing that World Kitchen is using improper hindsight to start with the solution to a problem and working backward to find that the solution was obvious because of the noted problem with the prior art. *KSR*, 550 U.S. at 421. Additionally, Martor argues that the '495 patent does not use cams to move the blade, and even if it did, the alleged cams move the blade of the knife in the '495 application backward in a different manner than the cams described in the '966 patent, which moves the blade forward. Martor also relies on *KSR*, to note that the combination of known elements into a new invention does not necessarily render the invention obvious without identifying a reason that would have prompted a person having ordinary skill in the art to combine the elements. *Id.* at 418–19. Finally, Martor notes that the examiner referenced the '495 application on the cover page of the '966 patent.

The Federal Circuit has held that "the challenger's 'burden is especially difficult when the prior art was before the PTO examiner during prosecution of the application.'" *Al-Site Corp. v.*

*VSI Int'l*, 174 F.3d 1308, 1323 (Fed. Cir. 1999) (quoting *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1467 (Fed. Cir. 1990)).  In the instant case, both the '520 patent and the '495 application were before the examiner during the '966 patent prosecution.  Therefore, World Kitchen has an especially difficult burden to meet.

World Kitchen begins its analysis by defining the problem in terms of the solution presented in the '966 patent.  It defines the problem as finding a way to convert a transverse force on a blade during the cutting process into a longitudinal motion for decupling the blade slide from the actuator slide.  World Kitchen's analysis epitomizes the improper hindsight the Supreme Court warned against in *KSR*.  550 U.S. at 421.  Further, World Kitchen argues that the '966 patent claims only a combination of known elements.  The Supreme Court, however, indicated that, "a patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art."  *Id.* at 418.  Neither of World Kitchen's arguments is sufficient to meet the "especially difficult" burden required in an obviousness analysis combining prior art that was known by the examiner at the time the examiner prosecuted the issued U.S. patent.  Therefore, the '966 patent is not obvious in view of the combination of the '520 patent and the '495 application.

**C.  The combination of the '520 patent and the '707 patent**

World Kitchen's final argument is combining the '520 patent with the '707 patent, describing a utility knife with a retractable blade and an improved slide, renders the '966 patent obvious.  As noted, the '520 patent discloses every element of the '966 patent except for the cam portion of the '966 patent.  Citing the '707 patent, World Kitchen argues that cams have been used to transfer the direction of motion in utility knives.  World Kitchen then concludes that

combining of the '520 patent and the '707 would be obvious to one having ordinary skill in the art.

Martor responds by arguing that although the '707 patent may include cams on a retractable blade utility knife, the cams operate only to reduce the movement of the blade or stop the blade from moving altogether. The cams of the '707 patent actually perform the opposite function as the cams in the '966 patent.

Prior to 2007, the Federal Circuit applied a teaching, suggestion, or motivation ("TSM") test when evaluating a patent for obviousness. *KSR*, 550 U.S. at 399. Under the Federal Circuit's TSM analysis, "a patent claim is only proved obvious if the prior art, the problem's nature, or the knowledge of a person having ordinary skill in the art reveals some motivation or suggestion to combine the prior art teachings." *Id*. In *KSR*, the Supreme Court held that a ridged application of the TSM test was improper, but it also indicated that the TSM test does provide helpful insight in the obviousness analysis. *Id.* at 401–02.

In the instant case, World Kitchen has argued that the '966 patent is obvious in view of the combination of the '520 patent and the '707 patent. The '707 patent teaches away from using the cams in a manner consistent with the cams in the '966 patent. In the '707 patent, the cam's function is to restrict the movement of the blade to limit the blade force on the blade slide. In the '966 patent, the cams are used to move the blade into a forward position. In other words, the '707 patent is teaching away from the use of cams to move a blade, which is the exact opposite function of the blade in the '966 patent.

Although, in pressing this argument, World Kitchen's burden of proving obviousness would have been greater if the examiner had considered the '707 patent at the time he examined

the '966 patent, World Kitchen must still provide reasons that a person having ordinary skill in the art would have been prompted to combine the prior art references. *Id.*; *see also Al-Site Corp.,* 174 F.3d at 1323. It has not done so here. In fact, if this court looks to the TSM test for insight, the '707 patent teaches away from the use of cams to move a blade in a knife. *KSR*, 550 U.S. at 401. Therefore, the court concludes that the '966 patent is not obvious in view of the combination of the '520 patent and the '707 patent.

For these reasons, the court finds that the '966 patent is not obvious in view of any of the prior art described above or any combination thereof.

## V. Breach of Contract

Martor has moved for partial summary judgment finding that World Kitchen breached the Settlement Agreement. Contract interpretation is a question of law to be determined by the court. *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir. 1995). Under the Settlement Agreement, the parties have stipulated to resolving disputes concerning the Settlement Agreement pursuant to the law of the State of Illinois. According to Illinois law, the court must implement the "four corners" rule in interpreting this contract. *Bourke*, 159 F.3d at 1036 (citing *AM Int'l Inc. v. Graphic Management Assoc., Inc*., 44 F.3d 572, 574 (7th Cir. 1995)). Both Martor and World Kitchen agree that the language of the Settlement Agreement is unambiguous, and that the contract should be enforced according to its written terms. *Bourke*, 153 F.3d at 1036. Because the parties agree that the terms of the Settlement Agreement are unambiguous, the court will enforce the contract according to the plain meaning of its terms. *Dowd & Dowd, Ltd. V Gleason*, 693 N.E.2d 358, 368 (Ill. Sup. Ct. 1998).

To prevail on a breach of contract claim under Illinois law, the plaintiff must allege and prove: "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *TAS Distributing Co., Inc. v. Cummins Engine*, 491 F.3d 625, 631 (7th Cir. 2007) (quoting *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. App. Ct. 1st Dist. 2004).

In Martor's motion for partial summary judgment, it argues that World Kitchen breached the terms of paragraph six of the Settlement Agreement, which states:

> Additionally, separate and distinct from its right of recovery for patent infringement, it shall constitute a material breach of this Agreement, entitling SPOILAGE [Martor] to an injunction and monetary damages, if WORLD KITCHEN makes, uses, sells, offers to sell or imports any knife that includes all of the following features:
>
> a.    A coupling member which shall mean a longitudinally extending member made of spring steel or deflectable plastic and engageable in a seat member during forward movement of the actuator slide into an intermediate position, the seat member being disposed or positioned on one of a blade slide and an actuator slide;
>
> b.    A decoupling means which shall mean a structure for disengaging the coupling member from the seat member with displacement of the coupling member out of the path of the seat member on displacement of the blade from its intermediate position into its extended position, wherein the structure includes at least one groove and a pin engaged in the groove; and,
>
> c.    A blade that automatically retracts fully into the housing after removal of the blade from a workpiece on which it has been engaged regardless of the position of the external actuator.
>
> Entitlement to the aforementioned injunction and monetary damages is contingent upon proof, in a court of competent law and jurisdiction, that WORLD KITCHEN has engaged in such conduct.

In response, World Kitchen does not dispute the existence of a valid and enforceable contract or Martor's resultant damages. World Kitchen, however, does dispute whether Martor

substantially performed its obligations under the Settlement Agreement and whether World Kitchen breached the Settlement Agreement.

### A. Plaintiff's Substantial Performance

Martor argues that it fulfilled all of its obligations under the Settlement Agreement. Martor executed and filed a joint stipulation of dismissal of the SK-6 Litigation with prejudice and a covenant not to sue World Kitchen under the '520 patent for infringement based on the manufacture, use, sale, offer for sale, or importation of the FLEXGUARD SK-6. Martor further contends that even if Martor did breach the Settlement Agreement by filing the original complaint, World Kitchen cannot prove, and did not even allege, damages resulting from Martor's alleged breach.

World Kitchen maintains that Martor repudiated the Settlement Agreement when it alleged in the instant complaint that paragraphs 4 and 5 of the Settlement Agreement were unenforceable and not binding. Alternatively, World Kitchen argues that Martor breached the terms of the Settlement Agreement by filing an unsealed copy of the Settlement Agreement in the court's public docket system along with its original complaint. World Kitchen then relies on Illinois case law to maintain that any breach of contract entitles the non-breaching party to nominal damages. *Real Estate Value Co. v. USAir, Inc.*, 979 F. Supp. 731, 741 (N.D. Ill. 1997) (applying Illinois law).

The court finds that Martor did not repudiate the Settlement Agreement when it filed its First and Second Amended complaints by indicating that the Settlement Agreement was valid except for paragraphs 4 and 5 of the agreement. Rather, Martor asserted that paragraphs 4 and 5 are not applicable to the instant litigation. The instant case concerns the '966, not the '520

patent. Although, the claims of the '966 and the '520 patents may be similar, they are not the same. Therefore, Mortar's accusations in its complaints do not repudiate the Settlement Agreement.

Paragraph 4 of the Settlement Agreement addresses the agreed upon claim construction for claims in the '520 patent in future patent infringement actions regarding the '520 patent. In the instant case, the patent infringement action is not "concerning the '520 patent." Therefore, paragraph 4 is not applicable to this litigation, and Martor's assertions in its complaints reflect the intent not to be bound by the Settlement Agreement claim construction regarding the '966 patent. Martor's assertions do not demonstrate a clear intent to repudiate the contract.

Similarly, paragraph 5 of the Settlement Agreement addresses conditions concerning proving infringement of the '520 patent against future World Kitchen products. In the instant case, Martor does not seek to prove "future infringement of the '520 patent." Therefore, paragraph 5 is not applicable to this litigation, and Martor's assertion in its complaints reflects the intent not to be bound by the claim construction set forth in the Settlement Agreement. Again, Martor's assertions do not demonstrate a clear intent to repudiate the contract.

By filing the original complaint in this action, however, Martor breached the Settlement Agreement by violating paragraph 11, the confidentiality clause of the agreement, when it did not file the complaint with portions of the Settlement Agreement under seal. World Kitchen, however, has not alleged any specific damages resulting from this breach. Accordingly, World Kitchen is entitled only to nominal damages for this breach of contract. *Real Estate Value Co. v. USAir, Inc.*, 979 F. Supp. 731, 741 (N.D. Ill. 1997) (applying Illinois law).

**B. World Kitchen's Breach**

Paragraph 6 of the Settlement Agreement is the subject of World Kitchen's alleged breach of contract. Neither party argues that the terms of paragraph 6 are ambiguous; however, the parties interpret the language of paragraph differently. The disputed terms in paragraph 6 are "a coupling member … made of spring steel or deflectable plastic," "engageable in a seat member," "a decoupling means … for disengaging the coupling member from the seat member," and "wherein the structure includes at least one groove and a pin engaged in the groove."

**1. A coupling member … made of spring steel or deflectable plastic**

Martor identifies the coupling member of the SK-8 as the blade slide tab. Martor further explains that the blade slide tab is longer than it is wide and is made of deflectable plastic. Additionally, Martor contends that the blade slide tab is made integrally with the blade slide from a single piece of polyoxymethylene plastic, and that plastic deflects under pressure. Therefore, Martor argues, that the blade slide tab of the SK-8 is the "coupling member … made of spring steel or deflectable plastic" as required by paragraph 6 of the Settlement Agreement.

World Kitchen argues that although the blade slide tab may be a coupling member, it is not made of spring steel or deflectable plastic. World Kitchen contends that although the blade slide may deflect under applied pressure, the blade slide tab is much thicker and considerably shorter than the blade slide and does not deflect under pressure. Finally, World Kitchen contends that because Martor has not directly proved that the blade slide tab is made of a deflectable plastic it has not met its burden of proof. Martor's Expert, Mr. Godsted, never tested the actual blade tab for deflection; rather, he deflected the blade slide.

The parties do not dispute that the blade slide tab of the SK-8 is made of polyoxymethylene plastic, but they disagree about whether the blade slide tab is deflectable. Although Martor has not directly established that the blade slide tab is deflectable, through the testimony of Mr. Godsted, it has established that polyoxymethylene is a plastic that does deflect under pressure.

The plain meaning of the term "coupling member … made of … deflectable plastic" means that the substance of the coupling member must be a deflectable plastic. The Settlement Agreement does not indicate that the coupling member must actually deflect during the operation of the device. In the instant case, the coupling member is made of polyoxymethylene plastic. Polyxymethylene plastic deflects under pressure, as do most plastic materials. Therefore, the coupling member of the SK-8, under the plain meaning of the terms in paragraph 6, is made of a deflectable plastic.

### 2. Engageable in a seat member

Martor identifies the seat member of the SK-8 to be a tab on the actuator slide of the SK-8. Martor then contends that the blade slide tab is "engageable in" the tab on the actuator slide in the SK-8 operation. The basis of Martor's contention is that in operation of the SK-8, the geometry of the two tabs creates a contact surface in which the tab on the actuator slide contacts the blade slide tab to move the blade slide into a functional cutting position. It contends that the surfaces of the coupling member (the blade slide tab) and the seat member (the tab on the actuator slide) are cooperatively sloped such that when they contact one another as the actuator is moved from an idle position, they become meshed or interlocked within the bounds of the overall shape of one another as required by paragraph 6 of the Settlement Agreement.

World Kitchen argues that the term "engageable in" requires the coupling member to engage within the seat member. World Kitchen then directs the court's attention to a very specific and limited portion of Martor's expert's, Mr. Godsted's, testimony to support its assertion: "[the coupling member and the seat member] are not engaged in each other because they are separate and they come apart."

Finally, Martor responded to World Kitchen's assertion that in additional testimony, Mr. Godsted indicated that the coupling member of the SK-8 was engaged in the seat member. Martor acknowledges the portion of the testimony cited by World Kitchen, but indicates that Mr. Godsted clarified his true opinion regarding the term "engaged in" later in his testimony.

The plain meaning of the term "coupling member engageable *in* a seat member" means that the seat member must substantially surround the coupling member during the engagement. For example, a padlock key is engageable *in* a padlock during the opening operation of the padlock. On the other hand, the term "engageable *with*" is a much broader term than the term "engageable *in*." For example, in a manual transmission car's drive-train a flywheel may be engagable *with* a clutch pad without the flywheel being substantially surrounded by the clutch pad. Further, the term "engageable *in*" is more specific than "engageable *with*" because the former implies a specific order relationship between the two parts and the latter does not. For example, a padlock is not engageable *in* a key, but a key could be engageable in a padlock. The term "engageable *with*" does not require the same relationship. For example, a flywheel is engageabe *with* a clutch pad and a clutch pad is engageable *with* a flywheel.

In the instant case, the coupling member is engageable *with* the seat member during the operation of the SK-8. The coupling member is not, however, engageable *in* the seat member.

Therefore, the SK-8 does not include a coupling member engageable in a seat member as required by paragraph 6 of the Settlement Agreement. Consequently, World Kitchen did not breach the Settlement Agreement by making and selling the SK-8, and Martor's motion for partial summary judgment is denied.

## CONCLUSION

For the foregoing reasons, the court: (1) grants World Kitchen's motion for summary judgment of non-infringement; (2) grants World Kitchen's motion for summary judgment for breach of the confidentiality clause of the Settlement Agreement; (3) denies World Kitchen's motion for summary judgment of invalidity and attorneys' fees; (4) grants Martor's motion to strike portions of World Kitchen's statement of facts in support of summary judgment; and (5) denies Martor's motion for partial summary judgment for breach of the Settlement Agreement.

This matter is set for a report on status on September 2, 2010, at 9:00 a.m.


**ENTER:** **August 19, 2010**


**Robert W. Gettleman**
**United States District Judge**